[No. 8193.]

### SCHOOL DISTRICT NO. 1 IN DENVER V. INTERNATIONAL TRUST COMPANY ET AL.

WILLS—*Construed.*  The testator especially commended to his executor one Mary McCarthy, an elderly cousin, expressing his earnest desire to so provide for her that she might be relieved of anxiety in her old age, and directing them to purchase ''any mortgage that may be upon her property,'' and hold it during her lifetime without exacting interest, in trust for a niece named, after the death of the said Mary McCarthy.  He further directed the executors to improve the property, expending in such improvements, and in the purchase of the mortgage, the sum of $5,000.00, authorizing them to sell ''sufficient of my London-Arizona stock, to carry out this provision,'' whenever it could be sold for not less than half its par.  By another clause of the will he provided that certain shares of mining stock should be held in trust for providing prizes to be awarded to the pupils of the public schools of the Denver School District, expressing the hope that ''the example will spread till it covers the country.''  *Held,* that the bequest to Mary McCarthy was not a specific legacy of the mere shares of stock mentioned, but the provision in her behalf was a charge upon the whole estate.

That the school district had no claim upon the body of the estate; that its rights were absolutely confined to the mining shares mentioned. (495, 496.)

*Error to Denver County Court.*  Hon. IRA C. ROTHGERBER, Judge.

Mr. WILLIAM B. TEBBETTS and Mr. HERBERT M. MUNROE, for plaintiff in error.

Messrs. GOUDY, TWITCHELL & BURKHARDT, Mr. PAUL M. CLARK, and Mr. EDGERTON CROUTER, for the defendants in error.

SCOTT, J., delivered the opinion of the court.

This action involves the construction of a will.  The testator thus describes himself in the opening paragraph:

"I, Fitz-James MacCarthy, newspaper writer of Denver, Colorado, and commonly known by my quill name, Fitz-Mac, which is the first part of both my names, make this my last will and testament, completely cancelling and revoking all other wills heretofore at any time by me made."

MacCarthy was of that type of newspaper writers, fast passing, if not wholly passed, typical of the earlier days of the Golden West.  These were buoyant, cheerful dreamers and prophets, whose enchanting stories enticed thousands of men and large sums of money westward, and whereby great lonely, rugged and unproductive mountains, and sun-scorched, barren plains, were transformed, as if by the touch of Aaron's rod, into flowing streams of precious metals, and fruitful fields of nature's riches.  We are indebted largely to these men for so early a creation of many of our new and prosperous commonwealths.

Coloradoans will recall the familiar *nom de plume* of this brilliant writer.  He wrote much of mines and mining camps in Colorado and Nevada.  To him every mining camp was an Eldorado, every mine a bonanza, and every important strike a glittering jewelry shop.

It was fitting and expected that the sole property bequeathed by the terms of his last testament should be mining stocks.  Nor was it to be otherwise expected than that he had implicit and unwavering faith in the merit and value of his stocks, and the property they represented.

The will is an unusually long and interesting document in which the decedent entered into great detail in the disposition of the great wealth which he thought was real.  The instrument displays all the calm confidence, nobility of mind and generosity of soul, that might have been expected of Colonel Sellers, had he made a will and thereby undertaken

to dispose of the princely revenues, confidently expected from the sale of his celebrated eye water.

MacCarthy at the time of the execution of the will, and in that happy frame of mind, induced by visions of the great wealth in which he firmly believed, and the beneficent purposes to which he would apply it, was the owner of 25,000 shares of the capital stock of the London-Arizona Copper Company of Arizona, which he seemed to prize highly, and which he declared was the principal asset of his estate. It is this stock that furnishes the basis for the dispute involved in this action.

Fearful that his executors might not be duly appreciative of the great value of this stock, and might regard it as being in the category of ordinary mining stocks, he cautioned them as follows:

"I am acquainted with the property and have a very high opinion of its prospective value. It has been capitalized and financed (up to date) on plans suggested by me. It is still in the prospect stage, but is a mining property of great promise. We have been selling the treasury stock to the public at six dollars ($6.00) a share, and there is every present reason to expect that by the time the pool agreement expires the shares will be worth their par value (ten dollars) at least. In my judgment, the property, once well started, will be able to earn, for a long period of years, a good return on a valuation of twenty-five dollars ($25.00) a share. I make this explanation, because there is so much worthless mining stock in the country that there is danger that my executors and legatees may regard this also as of little value; and I desire to have its value understood and the stock carefully conserved to fulfill the provisions of this testament."

MacCarthy appears to have been long on relatives and devoted friends, none of which he says were overlooked; and his great soul went out to hospitals, Christian associ-

ations, public schools and other kindred institutions designed for the betterment and uplift of the human race, to which he proposed to bring comfort and happiness through the instrumentality of his London-Arizona stocks.

But there is generally and unfortunately a difference between a state of mind and the cold cruel fact, and this instance forms no exception to the rule. The executors were compelled to report to the court that London-Arizona was worthless, and thus to dissolve into thin air, numerous friendly, charitable and benevolent bequests.

But other stocks of the estate, none of which were specifically mentioned in the will, turned out better than "London-Arizona," and the executors in their petition to the court, reported that they had, from the proceeds of these, paid all the debts of the estate, and have remaining on hand the sum of $3,530.06 for distribution under the will, together with other stocks undisposed of, including the London-Arizona stock specifically bequeathed to the divers and numerous persons and institutions therein mentioned.

The prayer of the executors was that they might be permitted to transfer all the shares of stock together with three thousand dollars in cash, to a trust for the benefit of the public schools of the City of Denver, to be administered under the terms of said 11th clause of the will, and that the capital stock of the London-Arizona Copper Company may be transferred to the various trusts designated, so that the benefit thereof may be administered according to the provisions of the will.

There appeared at the hearing upon the petition, Mary MacCarthy, the defendant in error, claiming as a general or demonstrative legatee under the will, as against the claimant School District No. 1, in the City and County of Denver.

The court rendered the following judgment: "And

the court having heard the arguments of counsel and being fully advised in the premises, doth find that it was the intention of the testator that the legacy to Miss Mary Mac-Carthy mentioned in paragraph fifth of said last will and testament be a charge upon the estate generally and be paid from any assets in the hands of the executors, and that said legacy was not intended to be and is not limited to the proceeds of the sale of the London-Arizona stock mentioned in said paragraph five.

"It is therefore, ordered, adjudged and decreed, that the petition of the executors, so far as it affects the provisions of paragraph five of said will, be denied, and that said executors be and they are hereby instructed and directed to at once expend the sum of five thousand dollars ($5,000.00) upon the property of Miss Mary MacCarthy in the manner directed in said paragraph five of said will and testament of Fitz-James MacCarthy, and that the money now in the hands of said executors be applied for said purpose, and that the deficit, if any, be realized from the sale of any assets available in the hands of the said executors, and that the administration upon said estate remain open for further proceedings in the premises covering the sale of assets of said estate for the purposes herein declared until the further order of this court."

Miss MacCarthy's claim is under the fifth paragraph of the will:

"I commend to my executors a special care of my beloved cousin, Miss Mary MacCarthy, who resides on her own property at the corner of Geddes and Otisco streets, Syracuse, New York. She has always been kind and helpful to me in periods of misfortune, and while I do not desire to leave her any legacy to be distributed again to her innumerable heirs upon her death, I do most earnestly desire to provide her with all the moderate and modest comforts of her sphere of life during her lifetime, so that she may be

relieved from anxiety in her old age. To provide for her, sufficiently yet very judiciously, is the first desire of my heart. I therefore direct my executor to purchase any mortgage that may be on her property, and hold it in trust or have it put in trust for my niece, Florence MacCarthy, my brother's daughter, on the death of my said cousin Mary.

I further direct my executors to improve her property to an extent altogether, including said mortgage, of five thousand dollars ($5,000.00), so that it will bring her an increased rental, and said mortgage shall include all expended for improvements. I desire that said mortgage shall run during her lifetime, so that she may not be tempted to sell her property. To the end that she may not be worried or bothered, it shall be without fail clearly and distinctly stated in the body of said mortgage that she is not required or expected to pay any interest on said mortgage during her lifetime, but the mortgage shall draw the legal interest after her death, and if she sell the property the mortgage shall become payable at once to my said niece. I desire my friend and executor, Dugan, as a friendly service, to make it clear to her that this is a measure for her protection against the solicitations of persons who might advise her injudiciously. As she is no longer young, I direct that this be done as soon as possible, and I authorize my executors to sell sufficient of my London-Arizona stock to carry out this provision, whenever it can be sold for not less than half its par value.

I accord to my executors full freedom to do this according to their own judgment, in a way that shall be perfectly satisfactory to my said cousin. I do not want her to be harassed, or feel that her home is endangered by such mortgage. I am herein making further provision for her.

But in case she has sold this property before these directions can be followed out, then the one thousand (1000) shares which I contemplate to have used for the said purpose

shall be held by the International Trust Company for her benefit during her lifetime, and at her death the stock shall go to my said niece, Florence MacCarthy, if she be living, and to the heirs of her body if she be dead, and if she be dead, leaving no heirs of her body, then it shall revert to my estate. This must not be held to affect the other provisions herein made for my said cousin Mary or my said niece Florence."

The claim of the school district rests upon the eleventh paragraph of the will. I set this out at some length, not because of the absolute necessity for so doing, but as showing the patriotic, artistic and humane spirit of the mind of the testator, and in the hope that some one with more substantial holdings, and with equal patriotism, and love of children and of nature, may see the way clear to follow the pathway thus marked out:

"Eleventh: The remainder, five thousand (5,000) shares, shall continue to be held in trust for the benefit of the public schools of the City of Denver, and the income shall be used to elevate and sustain the already fine character of the schools."

The devisor then enters into detail as to the manner and method of providing prizes as follows: The Fitz-Mac Primary Teachers' Cash Prizes; The Fitz-Mac School Flower Cash Prizes; The Fitz-Mac Pupils' Flower Cash Prizes; the Fitz-Mac Window Box Cash Prizes; and the Fitz-Mac Pupil-Hero Cash Prizes. He then recites:

"While all these prizes should be made only large enough to constitute a lively incentive, I desire that each shall in turn occasionally be made large enough to create a decided impression on the minds of pupils and their parents.

When money is in hand, I desire that occasional prizes be offered for the best essays on the habits of native Colorado birds and animals, and the merits and pleasures to

people of learning to observe and study their habits and of being kind to them. It would be well, also, in my opinion, to offer competitive prizes to the pupils who report cases of illegal cruelty to animals and children, with the humane view of securing relief. These reports should be systematically made to the proper authority, and a strict account kept of them, to encourage the children to feel their influence in creating public sentiment and assisting to enforce the laws. This should tend to make boys and girls effective democratic citizens by showing them that the law is king in a democracy. If my purpose can be carried out intelligently and with a moderate degree of enthusiasm by the commission superintending the matter, I believe it will quickly gain public approval, and encourage wealthy people to make similar provisions, all of which will tend to correct manifest deficiencies in our valuable educational system, and render school life less monotonous and irksome to children. I earnestly commend my motive in these provisions of my will for the public schools to the watchful care of the mothers and fathers of Denver, who tax themselves with such generous pride in the duty of maintaining our notably excellent public schools. I do not desire or intend to relieve them of paying school taxes. My motive is only to add something now lacking that will give brightness and an intelligent zest to the present too monotonous school life of their children. If they take interest enough in the experiment which I desire to inaugurate to make a notable success of it, the example will spread till it covers the country. Our fine school houses now look stark and dreary from the outside to children, and suggestive only of weary drudgery. Beautiful window boxes and flower beds will make them look cheerful and attractive. I wish to record the opinion that I am inaugurating a movement of far-reaching importance, and my hope is that its success in Denver may be made so impressive by the cordial co-operation of parents and pupils that wealthy people everywhere

will quickly provide for its adoption in their own localities. I love Denver and the people of Denver, who have always been encouraging and appreciative to me. I have long sincerely believed, and have often publicly stated the belief, that they are, as a whole, the brightest and most sympathetic and helpful people in America, full of ambition and especially proud of their public schools. I testify my admiration for their character by leaving for the help of their children an important part of my estate; and, trusting confidently in their intelligent co-operation in giving effect to my purpose, I invoke the blessings of heaven upon their efforts."

What a pity that Fitz-Mac's dream was not a reality!

The contention of the School District is that the bequest to Mary MacCarthy was a specific legacy of certain of the London-Arizona stocks, and not a general or demonstrative legacy under the will.

The rule of construction in such cases, together with a definition of these several terms, was well stated by Mr. Justice Campbell, in the case of *Nusly v. Curtis*, 36 Colo. 464, 85 Pac. 846, 7 L. R. A. (N. S.) 592, 118 Am. St. 113, 10 Ann. Cas. 1134. It was there said:

"The only question raised and decided below, and the only one presented here, is as to the nature of this legacy. The plaintiffs in error say that it is a demonstrative legacy, and therefore it was not adeemed by the testatrix in her lifetime. The defendants in error say that it was a specific legacy, and was subject to be and as a matter of fact was, adeemed by the testatrix in her lifetime by collecting and commingling it with her other funds. It is sufficiently exact for our present purpose to say that a general legacy is one which is payable out of the general assets of a testator's estate, such as a gift of money or other thing in quantity, and not in any way separated or distinguished from other things of like kind. A specific legacy is a gift by will of a specific article, or a particular part of the testator's estate,

which is identified and distinguished from all others of the same nature, and which is to be satisfied only by the delivery and receipt of the particular thing given. A demonstrative legacy partakes of the nature of both a general and specific legacy. It is a gift of money or other property charged on a particular fund in such a way as not to amount to a gift of the corpus of the fund, or to evince an intent to relieve the general estate from liability in case the fund fails. A specific bequest is subject to. ademption, but such is not true of a general, or a demonstrative, legacy. * * * and in ascertaining the nature of a given legacy, some, but not much, aid is to be derived from the adjudicated cases. The question is one of intent, to be gathered from the language used in creating it, in the light of the circumstances of the testator and the property which he is disposing of in his will."

It will be observed from a careful study of the bequest to Mary MacCarthy that it contains no specific bequest within this definition. The intent is plain from the language. "To provide for her sufficiently, yet very judiciously, is the first desire of my heart." "I do not desire to leave her any legacy to be distributed again to her innumerable heirs upon her death." "I accord to my executors full freedom to do this according to their judgment in a way that shall be satisfactory to my said cousin." Then the general direction to the executors to purchase any mortgage on her house; to make improvements on her house so that all told they may take a mortgage on her premises not to exceed five thousand dollars, without interest during her lifetime; to be held in trust for another until her death.

No stock is specifically mentioned and none specifically directed to be sold to accomplish this purpose. The intent to be gathered from all these declarations and others not referred to here, is plain; to care for this aged relative during her lifetime, and this to be from the estate as a whole.

It is true that provision is made that in case the house of Mary MacCarthy shall have been sold, then 1000 shares of the mining stock is to be held in trust for her during her lifetime. But this alternative situation did not arise and is therefore not to be considered.

But the School District can have no claim to the general estate in any event. Its legacy was confined absolutely and definitely to the income from 5000 shares of the mining stock, and was without question a specific bequest of the income from such stock alone. This is emphasized by the statement that: "I estimate that the income of the stock will average one year with another, for a long period at least, a dollar a share annually, and this fund should receive ultimately the income of seven thousand shares. All prizes from this fund shall be open to both sexes, regardless of color, religion or nationality." So that whatever may be said to be the rights of Mary MacCarthy under the will, it is plain that the School District can have no other claim than to the income from the specific number of shares of stock, so bequeathed in trust for its uses as specified in the will.

The School District therefore can have no interest in this suit. In our opinion the judgment of the County Court was right and should be affirmed.

*Affirmed.*

GABBERT, C. J. and GARRIGUES, J., concur.